

FILED

AUG 19 2005

CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| | \* | |
| BRAD COHEN; WILSON DOLDE; | \* | CIV 04-4043 |
| CHARLES R. DURHAM; HARVEY | \* | |
| EVEREST; DUANE FLOYD; LINDA | \* | |
| RAFFERTY; WELLS RICHARDS; | \* | |
| SAMUEL SKLAROFF; WAREN SOBERG; | \* | |
| and CURT S. TOMLINSON, | \* | |
| | \* | |
| Plaintiffs, | \* | MEMORANDUM OPINION |
| | \* | AND ORDER |
| vs. | \* | |
| | \* | |
| NORTHWESTERN GROWTH | \* | |
| CORPORATION; EXP@NETS, INC., f/k/a | \* | |
| COMMUNICATIONS SYSTEMS USA, | \* | |
| INC., n/k/a NETEXIT, INC.; MERLE D. | \* | |
| LEWIS; RICHARD HYLLAND; | \* | |
| DANIEL K. NEWELL; and AVAYA, INC., | \* | |
| | \* | |
| Defendants. | \* | |
| | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pending before the Court are Northwestern Growth Corporation's Motion to Dismiss, Doc. 41, Merle D. Lewis and Daniel K. Newell's Motion to Dismiss, Doc. 36 and Richard Hylland's Motion to Dismiss, Doc. 44. Avaya, Inc., filed a joinder in the motions to dismiss, Doc. 51. Defendants have also filed a Request for Judicial Notice, Doc. 38, in support of their motions to dismiss. The motions have been fully briefed and will be decided based upon the written record in this case.

## BACKGROUND

Plaintiffs are former business owners who sold their companies to Exp@nets, Inc., n/k/a Netexit, Inc. ("Exp@nets"), in 1998 and 1999 in exchange for both cash and restricted Exp@nets' stock. At the time of the sales, Exp@nets was a privately held company, but the Plaintiffs were

solicited to sell their companies to Exp@nets with the representations that the Defendants intended to pursue an initial public offering ("IPO") within a few months of Plaintiffs' sales to Exp@nets. The IPO never happened.

Northwestern Growth Corporation ("NGC") is a wholly owned subsidiary of Northwestern Corporation ("Northwestern"). The principal place of business for both NGC and Northwestern is Sioux Falls, South Dakota. Exp@nets is a Delaware corporation with its principal place of business in Colorado. Defendant Merle D. Lewis ("Lewis") served as the Chairman of the Board and Chief Executive Officer ("CEO") of Northwestern and NGC. He also served as the Chairman of the Board of Exp@nets. Defendant Richard Hylland ("Hylland") was the Vice Chairman of the Board of Directors of Exp@nets, the President and Chief Operating Officer of Northwestern (from May 1998) and the Vice Chairman of NGC. Hylland also served as the CEO of NGC (January 1998 through May 1998) and President and Chief Operating Officer of NGC (September 1994 through January 1998). Defendant Daniel K. Newell ("Newell") was the Vice President Finance for Northwestern (from 1995 to 1999), the Senior Vice President of Finances for Northwestern (from May 1999), and the Chief Financial Officer of Northwestern (July 1999). Newell also served as the Vice President (1995 to 1998), President, Managing Director and CEO of NGC (from May 1998). The remaining Defendant, Avaya, Inc., purchased substantially all of the assets and assumed certain liabilities of Exp@nets on October 30, 2003. Thus, Avaya is the successor in interest to the business and liabilities of Exp@nets.

Northwestern created NGC in 1994 to pursue and manage non-utility investments and development activities for Northwestern, focusing in the energy, energy equipment and energy services industries. In late 1997, the Board of Directors of Northwestern and NGC, including Defendants Lewis, Hylland and Newell, authorized the creation of Communications Systems USA ("CSUSA") to pursue a national "inter-connect" business to provide telephone hardware, software and wiring services to other businesses. CSUSA was incorporated in the State of Delaware on January 27, 1998. In February 1999, CSUSA's name was changed to Exp@nets.

2

Exp@nets purchased the stock of 26 local inter-connect companies, including those owned and operated by Plaintiffs. NGC owned a controlling percentage of Exp@nets' stock and each stockholder of an acquired company became a minority shareholder of Exp@nets. The consideration paid for each company was comprised of a combination of cash and Exp@nets' stock. Although the percentages of cash and stock varied amongst the Plaintiffs, it was approximately 50 percent cash and 50 percent stock. Plaintiffs contend that they sold their companies after receiving representations from Exp@nets that an IPO of Exp@nets' stock would occur imminently, and Plaintiffs would receive substantial additional cash compensation when they sold their Exp@nets' stock, receiving far more than if they sold their companies strictly for cash. Plaintiffs further contend the Exp@nets' stock only had value if Exp@nets conducted the IPO.

Despite the representations of an imminent IPO, Plaintiffs allege that Defendants did not intend to make an IPO of Exp@nets' stock. Rather, Plaintiffs alleged Defendants intended to keep Exp@nets as a subsidiary of Northwestern Corporation and use Exp@nets' revenues to bolster Northwestern's stock price. Additionally, Defendants Lewis, Newell and Hylland are alleged to have unjustly enriched themselves through a private equity company.

An IPO of Exp@nets' never occurred. In Northwestern's Quarterly Report of August 14, 2003, it reported that Northwestern had started a process to sell its interest in Exp@nets. Northwestern then filed for Chapter 11 bankruptcy on September 14, 2003. Exp@nets, n/k/a Netexit, Inc., filed for Chapter 11 bankruptcy on May 4, 2004. Avaya purchased substantially all of the assets of Exp@nets. None of the consideration received in the sale of Exp@nets' assets to Avaya was distributed to Exp@nets' minority shareholders, nor to any of the Plaintiffs, nor retained by Exp@nets. As a result of the methods used to sell the assets of Exp@nets, and the manner in which the proceeds were distributed, the Exp@nets' stock owned by the minority shareholders, including Plaintiffs, is now worthless. Plaintiffs allege they were defrauded out of approximately $20 million as a result of the Defendants' conduct and the events described above.

Damages are sought under federal securities laws and state securities laws, as well as under common law theories. Plaintiffs bring this action to redress alleged violations of the provisions of § 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2) ("Securities Act") (Count I), §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Exchange Act"), Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5 ("Rule 10b-5") (Count III), as well as under state securities laws (Counts V through IX) and common law theories of fraud (Counts II) and breach of fiduciary duty (Counts X and XI). Count IV is entitled "Rescission of Consideration Received in Form of Exp@nets Stock," which is an election of remedies rather than a separate cause of action.

Although Defendants have filed separate motions to dismiss the Amended Complaint, they have also incorporated into their briefs arguments contained in the briefs filed by the other Defendants. The Motions to Dismiss are filed pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, as well as the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, *et seq.* ("Reform Act").

NGC contends that the only reason it is named as a defendant in this action is because of its corporate relationship with Exp@nets, as all the claims against NGC are derivative of the Plaintiffs' allegations against Exp@nets. Thus, NGC maintains it cannot be held liable as a parent company of Exp@nets for any wrongdoing by its subsidiary. In addition to claiming that none of the nine causes of action against NGC are sufficiently pled, NGC contends that Plaintiffs have failed to tie any of the claims to NGC. NGC further argues that the only misstatement specifically attributed to NGC relates to a future occurrence, an Exp@nets' IPO, which cannot provide the basis for any securities fraud liability. Finally, most of Plaintiffs' claims against NGC are time-barred.

Lewis and Newell filed a joint Motion to Dismiss. They contend that the Amended Complaint should be dismissed on the following grounds. The federal and state securities fraud claims in Counts I, III, V, VI, VII, VIII and IX are barred by the applicable statutes of limitation and repose. Count II, alleging common law fraud, lacks particularity and is not cognizable under South

4

Dakota law because it is based upon representations regarding a possible future event and the oral representations are directly contradicted by a written contract. The remaining two claims in Counts X and XI, alleging breaches of fiduciary duties, are derivative claims that only the Exp@nets' bankruptcy trustee may prosecute.

Hylland seeks dismissal of all counts in the Amended Complaint on the following grounds. The claim under Section 10(b) of the Exchange Act and Rule 10b-5 are barred by the statute of limitations and it fails to meet the heightened pleading requirements of the Reform Act and Rule 9(b) because Plaintiffs do not plead fraud and scienter with particularity. Plaintiffs' claim is based on a single oral representation allegedly made by Hylland to one Plaintiff regarding a future IPO that was directly contradicted by the parties' written contract. As to the common law fraudulent inducement claim, including a request for rescission of the contracts, Plaintiffs have failed to plead fraud with particularity as required by Rule 9(b) and failed to state a claim. The breach of fiduciary duty claims fail because they are derivative claims, which may only be brought by Exp@nets' bankruptcy trustee. The Section 12(a)(2) claim under the Securities Act and state securities act claims are barred by the applicable statutes of limitation.

In response to the arguments advanced by the Defendants, Plaintiffs concede that Count X is a derivative claim and must be dismissed. As to the statute of limitations' arguments, Plaintiffs contend that the Sarbanes-Oxley Act of 2002 revives claims under both Section 12(a)(2) of the Securities Act and Section 10(b) of the Exchange Act that may have been time-barred under the previous statute of limitations. They maintain that the Amended Complaint alleges both fraud and scienter with particularity as required by the Reform Act and that the common law fraud claims meet the pleading requirements of Fed.R.Civ.P. 9(b).

In reply, Defendants contend that the Sarbanes-Oxley Act of 2002 does not apply to Section 12(a)(2) claims under the Securities Act and that, therefore, Count I is governed by the statute of limitations in 15 U.S.C. § 77m. Defendants reiterate their arguments regarding the lack of compliance with the Reform Act and Fed.R.Civ.P. 9(b)'s pleading requirements.

5

## DISCUSSION

A.    Count I -Section 12(a)(2) of the Securities Act

Count I of the Amended Complaint alleges a violation of Section 12(a)(2) of the Securities Act. Section 12(a)(2) allows a purchaser of a security to bring a private action against a seller that "offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading ...." 15 U.S.C. § 77l(a)(2) (Supp. 2005). Defendants contend this claim is barred by the three year statute of repose provided in 15 U.S.C. § 77m, which provides that a claim under Section 12(a)(2) of the Securities Act must be:

> brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence .... In no event shall any such action be brought to enforce a liability created ... under section 77l(a)(2) ... more than three years after the sale.

15 U.S.C. § 77m (Supp. 2005). The three-year limit in 15 U.S.C. § 77m is a period of repose, which is an outside limit and is not subject to equitable tolling. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991).

Plaintiffs, however, maintain that the extended statute of limitations set forth in the Sarbanes-Oxley Act, enacted on July 30, 2002, applies to their Section 12(a)(2) claim.[1] *See* 28 U.S.C. § 1658 (Supp. 2005). The statute of limitations was extended by the Sarbanes-Oxley Act for private causes of action alleging securities fraud:

> [A] private right of action that involves a claim of *fraud, deceit, manipulation, or contrivance* in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the [Exchange Act] (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of – (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation.

28 U.S.C. § 1658(b) (emphasis added) (Supp. 2005). The case cited by Plaintiffs in support of this argument, *Roberts v. Dean Witter Reynolds, Inc.*, 2003 WL 1936116 (M.D. Fla. Mar. 31, 2003),

---

[1]Pub.L.No. 107-204, § 804, 116 Stat. 745, 801 (2002) codified in part at 28 U.S.C. § 1658(b).

*vacated and remanded by, Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275 (11th Cir. 2005). does not specifically address whether the Sarbanes-Oxley Act applies to Section 12(a)(2) claims. It is not clear from the opinion in *Roberts* that the plaintiffs brought a Section 12(a)(2) claim. *See id.*

Citing three cases that specifically address the statute of limitations applicable to Section 12(a)(2) claims, Defendants contend that the Sarbanes-Oxley statute of limitations does not apply to strict liability claims under Section 12(a)(2), because such claims do not involve "fraud, deceit, manipulation or contrivance." *See Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 2004 WL 574665, at *13 (N.D. Ill. Mar. 22, 2004) (collecting cases and holding that "plaintiff's strict liability claims brought under Sections 11, 12(a)(2) ... [of the Securities Act] are not covered by the Sarbanes-Oxley Act."); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 2004 WL 405886, at *12 (S.D. Tex. Feb. 25, 2004) (holding that the Sarbanes-Oxley statute of limitations does not apply to negligence and strict liability claims brought under Sections 11 and 12); *In re Worldcom, Inc. Sec. Litig.*, 294 F.Supp.2d 431, 444 (S.D.N.Y. 2003) (same).

The Court agrees with the case law cited by Defendants holding that the extended statutes of limitation in the Sarbanes-Oxley Act do not apply to Section 12(a)(2) claims. *See id.* The United States District Court for the Southern District of New York explained that:

> If Congress had intended to extend the statute of limitations for every private securities law claim, it could have done so. [The Sarbanes-Oxley Act] does not, however, state that it extends the statute of limitations for all claims under the securities laws. Instead, it includes limiting language that extends the time for private causes of action under the securities laws only for claims that involve "fraud, deceit, manipulation or contrivance." This language does not encompass Sections 11 and 12(a)(2) claims.

*In re Worldcom*, 294 F.Supp.2d at 444. Thus, the Court will apply the statute of limitations and repose set forth in 15 U.S.C. § 77m to Count I.

The last sales of Exp@nets' stock to any of the Plaintiffs occurred on September 30, 1999. (AC[2] ¶¶ 90, 101.) This action was filed on March 17, 2004, which is more than three years later than the last sales of Exp@nets' stock to Plaintiffs. Thus, Plaintiffs' Section 12(a)(2) claims are barred by the three-year statute of repose in 15 U.S.C. § 77m and Count I must be dismissed with prejudice.

Included in Count I are allegations of controlling person liability pursuant to § 15 of the Securities Act, 15 U.S.C. § 77o (1997). (AC ¶ 141.) In light of the dismissal of the primary violations of § 12(a)(2) in this action, however, the controlling person liability claims under § 15 must be dismissed. *See Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 550 n.12 (8th Cir. 1997) (citing *Van Dyke v. Coburn Enter. Inc.*, 873 F.2d 1094, 1100 (8th Cir. 1989)).

B.    Count III - Section 10(b) of the Exchange Act and Rule 10b-5

The Exchange Act was enacted "in order to promote full disclosure and thereby protect investors against manipulation of stock prices." *Alpern v. Utilicorp United, Inc.*, 84 F.3d 1525, 1533 (8th Cir. 1996); 15 U.S.C. § 78j (Supp. 2005). Section 10(b) of the Exchange Act specifically prohibits the use of any "manipulative or deceptive device or contrivance" in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b).

Rule 10b-5, promulgated under the Exchange Act, by the SEC, provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
    (a) To employ any device, scheme, or artifice to defraud,
    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (2004).

---

[2]"AC" refers to the Amended Complaint.

### 1. Statute of Limitation

The first issue that must be addressed regarding Plaintiffs' Section 10(b) and Rule 10b-5 claims is Defendants' argument that these claims are barred by the statute of limitations. Unlike Plaintiffs' Section 12(a)(2) claim, Plaintiffs' Section 10(b) and Rule 10b-5 claims do allege securities "fraud," which is governed by the Sarbanes-Oxley Act. The disputed issue is whether the Sarbanes-Oxley Act revived Section 10(b) and Rule 10b-5 claims that were barred by the statute of limitations in 15 U.S.C. § 77m before enactment of the Sarbanes-Oxley Act. Several courts have addressed this issue, with all but one court ruling that the Sarbanes-Oxley Act did not revive Section 10(b) and Rule 10b-5 claims that were time-barred before enactment of the Sarbanes-Oxley Act. *See In re Enter. Mortgage Acceptance Co., LLC, Sec. Litig.*, 391 F.3d 401 (2d Cir. 2004) (affirming *In re Enter. Mortgage Acceptance Co., LLC, Sec. Litig.*, 295 F.Supp.2d 307, 317 (S.D.N.Y. 2003)); *In re Worldcom, Inc. Sec. Litig.*, 2004 WL 1435356, at *7 (S.D.N.Y. June 28, 2004) (finding that "[t]here is no explicit language in the statute stating that it applies retroactively or that it operates to revive time-barred claims. Applying the statute of limitations that was lengthened in July 2002 to claims that expired in June 2002 would affect the substantive rights of the defendants by depriving them of a defense on which they were entitled to rely."); *Lieberman v. Cambridge Partners, LLC*, 2004 WL 1396750, *3 (E.D. Pa. June 21, 2004); *In re Enron*, 2004 WL 405886, at *17; *Glaser v. Enzo Biochen, Inc.*, 303 F.Supp.2d 724, 734 (E.D. Va. 2003); *In re Heritage Bond Litig.*, 289 F.Supp.2d 1132, 1148 (C.D. Cal. 2003); *cf. Roberts*, 2003 WL 1936116, *3 (finding that although Congress did not expressly use the term, "retroactive application," or prescribe the temporal reach of the statute, the legislative history "reveals that Congress intended to lengthen the statute of limitations to enable people who lost their life-savings to companies like Enron to recover some of their investments. To do so, the amendment must be given retroactive application[,]" and holding that the amendment revives expired claims).

Plaintiffs argue the language in the Sarbanes-Oxley Act that the revised statute of limitations "shall apply to all proceedings ... commenced on or after" the date of the Act's enactment, is a clear indication that Congress intended for the Sarbanes-Oxley Act to be applied retroactively. Pub.L. No. 107-204 § 804(b), 116 Stat. at 801 (at 28 U.S.C. § 1658 note). Noting that their complaint was

"commenced on or after" the date of enactment of the Sarbanes-Oxley Act, Plaintiffs contend the plain language of the statute shows they are entitled to the longer statute of limitations under 28 U.S.C. § 1658.

After the briefing in this case was completed, the Eighth Circuit Court of Appeals held that the Sarbanes-Oxley Act's amended limitations period for securities fraud actions is not retroactive. *See Foss v. Bear, Stearns, & Co., Inc.*, 394 F.3d 540, 542 (8th Cir. 2005). In holding that the plaintiff's stale securities fraud claim could not be revived, the Eighth Circuit found the Second Circuit's decision in *In re Enterprise*, 391 F.3d 401, persuasive and had nothing to add to that Circuit's explanation. *See Foss*, 394 F.3d at 542. Thus, the expanded statute of limitations does not apply to Plaintiffs' securities fraud claims.

Because the expanded statute of limitations in the Sarbanes-Oxley Act does not apply to Plaintiffs' Section 10(b) or Rule 10b-5 claims, the applicable statute of limitations is set forth in 15 U.S.C. § 77m, quoted above in the discussion of Plaintiffs' Section 12(a)(2) claim. The three-year limit in 15 U.S.C. § 77m is a period of repose, which is an outside limit and is not subject to equitable tolling. *See Lampf*, 501 U.S. at 363. Several Plaintiffs' claims are barred by the three-year period of repose in 15 U.S.C. § 77m, because they sold their companies more than three years before the enactment of the Sarbanes-Oxley Act on July 30, 2002. Plaintiff Floyd sold his company, IVDS, to Exp@nets on June 3, 1998. (AC ¶ 57.) Plaintiffs Rafferty and Dolde sold their company, Telexec, to Exp@nets on November 18, 1998. (AC ¶ 61.) Plaintiffs Cohen and Richards sold their company, SIMOD, to Exp@nets on March 22, 1999. (AC ¶ 69.) Plaintiff Sklaroff sold his company, ACS, to Exp@nets on June 30, 1999. (AC ¶ 81.) Thus, the Section 10(b) and Rule 10b-5 claims asserted by Plaintiffs Floyd, Rafferty, Dolde, Cohen, Richards and Sklaroff, are time-barred and will be dismissed.

The remaining Plaintiffs' claims are not barred by the three-year period of repose, but Defendants contend these claims are barred by the one-year statute of limitations in 15 U.S.C. § 77m, because Plaintiffs were on inquiry notice of the alleged fraud by no later than July 30, 2001 - one

10

year before the enactment of the Sarbanes-Oxley Act. The one-year period of limitations provides that the action must be brought within one year after the discovery of the alleged misrepresentation or "after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. Plaintiffs contend they were not on inquiry notice of the alleged fraud until April 15, 2003, when Northwestern issued its 2002 Annual Report.

The Eighth Circuit recognizes that the reasonable diligence standard in 15 U.S.C. § 77m, is an objective one, "commonly referred to as the doctrine of 'inquiry notice,' because the one-year limitations period may be triggered even though the victim is unaware of the misleading statements if, in exercising reasonable diligence, he should have discovered their misleading nature." *Ritchey v. Horner*, 244 F.3d 635, 638-39 (8th Cir. 2001). In considering whether inquiry notice exists, the Court must determine: "(1) the facts of which the victim was aware; (2) whether a reasonable person with knowledge of those facts would have investigated the situation further; and (3) upon investigation, whether the reasonable person would have acquired actual notice of the defendant's misrepresentations." *Great Rivers Co-op. of Southeastern Iowa v. Farmland Ind., Inc.*, 120 F.3d 893, 896 (8th Cir. 1997).

A plaintiff can be found to have been on inquiry notice "when there are 'storm warnings' that would alert a reasonable person of the possibility of misleading information, relayed either by an act or by omission.'" *Great Rivers,* 120 F.3d at 896 (quoting *Davidson v. Wilson*, 973 F.2d 1391, 1402 (8th Cir. 1992)). As explained by the Second Circuit, "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises." *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 154 (2d Cir. 2003) (quotation marks and citation omitted). The Court recognizes that the issue of whether a plaintiff was on inquiry notice is "'often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6).'" *Id.* at 156 (quoting *Marks v. CDW Computer Ctr., Inc.*, 122 F.3d 363, 367 (7th Cir. 1997)); *see Foss,* 394 F.3d at 542 (recognizing that the period of limitations is an affirmative defense and that "[u]nless the complaint alleges facts that create an ironclad defense, a limitations argument must await factual development."). But where the complaint contains facts needed to determine if a

11

reasonable investor of ordinary intelligence would have been aware of the existence of the alleged fraud, the Court may properly rule on the issue of inquiry notice on a motion to dismiss. *See id.*

The three Plaintiffs' Section 10(b) and Rule 10b-5 claims that are not barred by the three-year statute of repose in 15 U.S.C. § 77m are Tomlinson, Durham and Soberg. Plaintiffs Tomlinson and Durham sold their company, Global Internet Associates, to Exp@nets on September 30, 1999. (AC ¶ 90.) Plaintiff Soberg sold his interest in the companies, Vector Technology, Inc., Vector Utah and Vector California ("Vector"), to Exp@nets on September 30, 1999. (AC ¶¶ 91, 92, 101.) The allegations in the Amended Complaint regarding representations made to Plaintiffs Tomlinson, Durham and Soberg, were that an IPO of Exp@nets would occur before the end of 1999. (AC ¶¶ 85, 88, 89, 94, 96, 98, 100). On November 16, 1999, a meeting was held in Chicago between the Defendants and the minority shareholders of Exp@nets, including Plaintiffs, where Defendants Lewis, Hylland and Newell "falsely represented to the minority shareholders that the IPO was still on course, but that it may be delayed six (6) months until Exp@nets had hired a new CEO." (AC ¶ 105.) Approximately three months after the Chicago meeting a new CEO, James Walker, was introduced to the minority shareholders of Exp@nets and he promised them that Exp@nets was still on course for the IPO. (AC ¶ 111.) In approximately March 2000, a Northwestern employee called Plaintiff Sklaroff to tell him that Exp@nets was going to purchase another company, which would delay the IPO for a short while, but that the IPO would still occur. That acquisition was completed on March 31, 2000. March 2000 is the last specific date contained in the Amended Complaint regarding representations made to minority shareholders that the Defendants intended to conduct an IPO.

Plaintiffs then generally allege that "[r]epresentatives of Exp@nets including, Walker, Younger, Hylland and Lewis continued to represent to minority shareholders that an IPO of Exp@nets stock would occur." (AC ¶ 115.) While this general allegation does not indicate when the last of these misrepresentations was made or whether Plaintiffs Tomlinson, Durham or Soberg were aware of such misrepresentations, accepting Plaintiffs' allegations as true and giving Plaintiffs the benefit of all reasonable inferences, the Court does not find that it is clear from the allegations

12

in the complaint that no relief can be granted under any set of facts that could be proved consistent with the allegations. *See Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995) (providing the standard for granting a motion to dismiss under Rule 12(b)(6)). The Court does not find that the complaint contains facts demonstrating that a reasonable investor of ordinary intelligence would have been aware of the existence of the alleged fraud by July 30, 2001. *See LC Capital Partners*, 318 F.3d at 154. The Court recognizes that, "[a] motion to dismiss should be granted "as a practical matter ... only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey*, 44 F.3d at 671 (quotation marks and citations omitted). It is not clear from the face of the Amended Complaint that Plaintiffs Tomlinson, Durham or Soberg were on inquiry notice of the alleged fraud as of July 30, 2001, thus their Section 10(b) and Rule 10b-5 claims are not barred by the statute of limitations in effect before the Sarbanes-Oxley Act. *See* 15 U.S.C. § 77m.

Defendants further argue that even if Plaintiffs were not on inquiry notice by July 30, 2001, such that the two-year statute of limitations under the Sarbanes-Oxley Act applies to Plaintiffs, they were on inquiry notice of the alleged fraud not later than March 17, 2002, two years before commencing this action, thus barring their claims under 28 U.S.C. § 1658. Plaintiffs contend that the doctrine of inquiry notice does not apply to the expanded statute of limitations under the Sarbanes-Oxley Act. The Court finds it unnecessary to make this determination, however, because even if the inquiry notice doctrine applies to the expanded statute of limitations, the Court does not find that the allegations in the Amended Complaint show that Plaintiffs Tomlinson, Durham or Soberg were on inquiry notice of the alleged fraud not later than March 17, 2002. Thus, Plaintiffs Tomlinson, Durham and Soberg's Section 10(b) and Rule 10b-5 claims will not be dismissed based upon the statute of limitations.

### 2. Pleading fraud with particularity under the Reform Act

Because Plaintiffs Tomlinson, Durham and Soberg's Section 10(b) and Rule 10b-5 claims are not subject to dismissal based upon expiration of the statute of limitations, the Court must consider Defendants' remaining arguments for dismissal. The following discussion relates only to

these three Plaintiffs' Exchange Act claims. In private securities fraud litigation, there are two heightened pleading requirements. "'The first requires that the complaint specify each false statement or misleading omission and explain why the [false statement or] omission was misleading.'"[3] *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 741-42 (8th Cir. 2002) (quoting *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 654 (8th Cir. 2001)). The second requirement is that "'the complaint [must] state "with particularity" facts giving rise to a "strong inference" that the defendant acted with the scienter required for the cause of action.'"[4] *Id.* (quoting *Green Tree*, 270 F.3d at 654). The Court must dismiss claims that do not meet the

---

[3]The first pleading requirement is provided in 15 U.S.C. § 78u-4(b)(1) (1997):

**(b) Requirements for securities fraud actions**
  **(1) Misleading statements and omissions**
  In any private action arising under this chapter in which the plaintiff alleges that the defendant –
      **(A)** made an untrue statement of a material fact; or
      **(B)** omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
  the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

[4]The second heightened pleading requirement is provided in 15 U.S.C. § 78u-4(b)(2) (1997):

**(b) Requirements for securities fraud actions**
  **(2) Required state of mind**
  In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

14

requirements for pleading securities fraud actions set forth in § 78u-4(b)(1) & (2). *See* 15 U.S.C. § 78u-4(b)(3)(A) (1997).

Although the Court must assume all factual allegations in the complaint are true in deciding a motion to dismiss under Rule 12(b)(6), "under the Reform Act we disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute." *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001) ("*Green Tree*") (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999)). Scienter is not explicitly mentioned in the statutory text or the rule, but it is an essential element of a Section 10(b) and Rule 10b-5 claim. *See Alpern*, 84 F.3d at 1533-34; *Green Tree*, 270 F.3d at 653. In contrast to the plaintiff's entitlement to all reasonable inferences that may be drawn from the allegations of the complaint under Fed.R.Civ.P. 12(b)(6):

> [U]nder the Reform Act, a securities fraud case cannot survive unless its allegations collectively add up to a strong inference of the required state of mind. "Congress has effectively mandated a special standard for measuring whether allegations of scienter survive a motion to dismiss. While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable .... Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences."

*Green Tree*, 270 F.3d at 660 (quoting *Greebel v. TFTP Software, Inc.*, 194 F.3d 185, 195-96 (1st Cir. 1999)). *See Helwig v. Vencor, Inc.*, 251 F.3d 540, 551 (6th Cir. 2001) (en banc) (explaining that "[T]he strong inference requirement means that plaintiffs are entitled only to the most plausible of competing inferences.").

The Eighth Circuit explained that, "[s]tanding under § 10(b) and Rule 10b-5 requires a showing of (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit; (2) causation, often analyzed in terms of materiality and reliance; (3) damages; and (4) fraudulent activity occurring in connection with the purchase and sale of a security." *Alpern*, 84 F.3d at 1533-34. As mentioned above scienter is an essential element of Section 10(b) and Rule 10b-5 claims. Scienter is defined as "'the intent to deceive, manipulate, or defraud.'" *Green Tree*, 270 F.3d at 653 (quoting *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 320 (8th Cir. 1997)). In the

Eighth Circuit, recklessness satisfies the scienter requirement. Recklessness, as defined in the Eighth Circuit, is:

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Green Tree*, 270 F.3d at 654 (quoting *Camp v. Dema*, 948 F.2d 455, 461 (8th Cir. 1991)).

Motive and opportunity allegations to satisfy the scienter requirement were discussed by the Eighth Circuit in light of the enactment of the Reform Act:

> [W]e can say three things about motive and opportunity allegations. First, motive and opportunity are generally relevant to a fraud case, and a showing of unusual or heightened motive will often form an important part of a complaint that meets the Reform Act standard. Second, in some cases the same circumstantial allegations that establish motive and opportunity also give additional reason to believe the defendant's misrepresentation was knowing or reckless. .... Third, when the complaint does not show motive and opportunity of any sort - either the unusual, heightened motive highlighted in the Second Circuit cases, or even an everyday motive such as keeping one's job - then other allegations tending to show scienter would have to be particularly strong in order to meet the Reform Act standard.

*Green Tree*, 270 F.3d at 660.

The Court will separately consider Defendants' arguments regarding pleading fraud with particularity because the allegations are somewhat different against the Defendants.

### A. Defendants Newell and Lewis

Defendants Newell and Lewis contend that Plaintiffs' allegations in the Amended Complaint rely upon group pleading and that such group pleading does not meet the first pleading requirement in the Reform Act. *See* 15 U.S.C. § 78u-4(b)(1). Plaintiffs contend that the Eighth Circuit has not rejected the group pleading doctrine, but then argue that the Amended Complaint does not rely on the group pleading doctrine as it specifically identifies who said what and when. Pointing to paragraphs 45 through 101 of the Amended Complaint, Plaintiffs maintain that the Amended

Complaint alleges numerous and consistent oral misrepresentations made to each Plaintiff. Plaintiffs also allege a brochure was delivered to each of them containing misrepresentations and they assert that the Amended Complaint clearly identifies the misleading statements or omissions. (AC ¶¶ 37, 156.)

The only three Plaintiffs' securities fraud claims that are not barred by the statute of limitations are Tomlinson, Durham and Soberg. Paragraphs 82 through 90 set forth the allegations relating to Tomlinson and Durham. Paragraphs 91 through 101 set forth the allegations relating to Soberg. Although Newell and Lewis are specifically referred to in other paragraphs in the Amended Complaint as making oral misrepresentations regarding an impending IPO to other Plaintiffs, neither Newell nor Lewis are identified as making oral misrepresentations to the three Plaintiffs whose Section 10(b) and Rule 10b-5 claims are not barred by the statute of limitations.  Thus, as to oral misrepresentations, Plaintiffs Tomlinson, Durham and Soberg have not met the pleading requirement of the Reform Act to "specify each false statement or misleading omission," made by Defendants Newell and Lewis. *See* 15 U.S.C. § 78u-4(b)(1).

There are several oral misrepresentations Plaintiffs claim various Defendants made during the months following Plaintiffs Tomlinson, Durham and Soberg's sales of their businesses to Exp@nets. (AC ¶¶ 105-115.) These oral representations, however, were not made "in connection with the purchase or sale of any security," 15 U.S.C. § 78j, because Plaintiffs sold their companies and received Exp@nets' stock as part of the consideration paid by Exp@nets *before* any of the alleged oral misrepresentations set forth in paragraphs 105-115 of the Amended Complaint were made. Thus, Plaintiffs could not have relied upon these alleged oral misrepresentations in selling their businesses to Exp@nets.    Lacking the element of causation, these alleged oral misrepresentations cannot form the basis of Defendants' liability on a Section 10(b) or Rule 10b-5 claim.

In addition to oral misrepresentations, Plaintiffs allege Defendants Newell and Lewis "participated in and/or approved the Brochure that was used to solicit Plaintiffs to sell their

companies to Exp@nets." (AC ¶ 156.) Plaintiffs Tomlinson and Durham do not allege that they received or relied on the representations made in the brochure. (AC ¶¶ 82-90.) Thus, Plaintiffs Tomlinson and Durham have not satisfied the first pleading requirement to allege a false statement made in connection with the sale or purchase of a security and their Section 10(b) and Rule 10b-5 claims must be dismissed against Newell and Lewis.

Plaintiff Soberg, however, does specifically allege that he received the Brochure and that he reviewed it in making his decision to sell his interest in the companies referred to as "Vector" in the Amended Complaint. (AC ¶¶ 94, 96.) The Brochure makes the following representations:

### A NEW YORK STOCK EXCHANGE CALIBER STRATEGY.

○   CSUSA has a significant available capital base of over $100m to be utilized in the merger and acquisition of its founding operations. Following its initial acquisitions, the anticipated 1998 NYSE public offering of CSUSA will create substantial additional value for its founding owners, their employees and their customers.

○   OPPORTUNITIES WITHOUT PRECEDENT
  ■   For Your Value
    •   With innovative structural alternatives, Exp@nets allows you to choose an approach that is right for you, including cash and Exp@nets stock. It's your choice based upon your personal tax, estate or succession objectives. You may chose to share in the benefits of Exp@nets's anticipated 1998 NYSE public offering. However, because we have significant capital resources, our acquisition commitments are not dependent upon a public offering.

(AC ¶ 37.) The Brochure's reference to "CSUSA," is an acronym for Communications Systems USA, which is the predecessor of Exp@nets. (AC ¶ 35.) In February 1999, CSUSA's name was changed to Exp@nets. (AC ¶ 35.)

The Brochure refers to a public offering that was to occur in 1998. The negotiations with Soberg, however, did not begin until the spring of 1999. An employee of Exp@nets, Robert Hogan,

18

provided the Brochure to Soberg and "advised that Exp@nets had extended the IPO date from the one mentioned in the Brochure in order to add more data oriented companies to Exp@nets." (AC ¶ 94.) In May 1999, Hogan "went through the Brochure that Exp@nets was going public before the end of the year," during a presentation soliciting Soberg to sell his interest in Vector. (AC ¶ 96.)

The first pleading requirement has been met, because Soberg has stated with particularity the statements in the Brochure that he alleges were false and why they were false. *See* 15 U.S.C. § 78u-4(b)(1). The Plaintiffs clearly identified Newell and Lewis as participating in the preparation and/or approval of the Brochure, thus Plaintiffs did not rely on the group pleading doctrine as to the Brochure. (AC ¶ 156.) Soberg does not point to the representation in the Brochure that the IPO would occur by the end of 1998 as being a false statement. Rather, he alleges that Newell and Lewis's basic representation that they intended to conduct an IPO of Exp@nets' stock was a false statement and it was false because they had no intention of conducting an IPO at any time.

The second requirement under the Reform Act is to state with particularity facts giving rise to a strong inference of scienter. *See* 15 U.S.C. § 78u-4(b)(2); *Alpern*, 84 F.3d at 1533-34; *Green Tree*, 270 F.3d at 653 (explaining that although scienter is not explicitly mentioned in the statutory text or the rule, it is an essential element of a § 10(b) and Rule 10b-5 claim). The scienter alleged by Plaintiffs is that Defendants never had any intention of making an IPO of Exp@nets' stock, despite the representations made to the Plaintiffs during negotiations for the sales of their companies in 1998 and 1999 that an IPO would occur imminently. (AC ¶¶ 1-3, 154, 156.) Plaintiffs further allege that Lewis and Newell intended to unjustly enrich themselves through a "private equity" company (AC ¶ 3, 110, 116, 154, 156.) Lewis and Newell are alleged to have received millions of dollars in Exp@nets private equity company "profits" at the direct expense of Exp@nets and the minority shareholders of Exp@nets. (AC ¶ 116.) In sum, Plaintiffs allege Lewis and Newell had no intention of conducting an IPO of Exp@nets, but they approved a Brochure representing the imminency of an Exp@nets IPO, knowing that the Brochure would be used to solicit individuals like Plaintiffs to sell their companies to Exp@nets for approximately 50 percent cash and 50 percent stock in Exp@nets, which would not be worth the value of 50 percent of the companies being sold

19

to Exp@nets. Rather than simply being a scheme to increase their compensation, the scheme alleged by Plaintiffs is one designed to defraud people such as the Plaintiffs out of approximately 50 percent of the value of their companies. Based upon the above discussion and the entirety of the Amended Complaint, the Court finds that Plaintiff Soberg has satisfied the second pleading requirement under the Reform Act, because the facts stated with particularity in the Amended Complaint give rise to a strong inference of scienter by Lewis and Newell.

### B. Defendant Hylland

Defendant Hylland asserts that Plaintiffs' entire Section 10(b) and Rule 10b-5 claims against him are based upon alleged oral representations made by various Exp@nets' employees that an IPO of Exp@nets' stock would occur soon after Plaintiffs sold their companies to Exp@nets. He further avers that the only misrepresentation he allegedly made to any Plaintiff before the sale of their companies, is his statement in March 1998 to Plaintiff Floyd that "an IPO would take place before the end of the year." (AC ¶ 52.) The Court has already determined that Plaintiff Floyd's Section 10(b) and Rule 10b-5 claims are time-barred. Thus, Hylland cannot be held liable for this oral representation under the Exchange Act.

The one representation that the Court found actionable above was the alleged false written representation in the Brochure. Although Hylland claims that there are no specific factual allegations that he was involved in the drafting, editing or dissemination of the Brochure, Plaintiffs specifically name Hylland as one of the persons who "participated in and/or approved" the Brochure. (AC ¶ 156.) Of the three Plaintiffs' claims that are not time-barred, only Plaintiff Soberg alleges he received and considered the Brochure in deciding whether to sell his interest in a company to Exp@nets. The ruling above that Plaintiff Soberg has met the Reform Act's first pleading requirement as to this claim against Defendants Lewis and Newell, equally applies to his claim against Defendant Hylland.

Regarding the second pleading requirement, to state with particularity facts giving rise to a strong inference of scienter, Plaintiffs allege Hylland, in addition to Newell and Lewis, received

20

millions of dollars in Exp@nets private equity company "profits" at the direct expense of Exp@nets and the minority shareholders of Exp@nets. (AC ¶ 116.) The discussion above regarding scienter by Lewis and Newell applies equally to Hylland and the Court finds the Amended Complaint states particular facts giving rise to a strong inference of scienter by Hylland. Thus, Plaintiff Soberg's Section 10(b) and Rule 10b-5 claims survive the statute of limitations and meet the Reform Act's pleading requirements and will not be dismissed. The remainder of the Exchange Act claims against Hylland will be dismissed for the reasons set forth above.

### C.  Defendant Northwestern Growth Corporation

NGC contends that the only reason it is named as a Defendant in this action is because of its corporate relationship with Exp@nets. NGC is the majority shareholder and parent company of Exp@nets. The thrust of NGC's argument is that as a parent company of Exp@nets, NGC cannot legally be held liable for any wrongdoing by its subsidiary. In addition, NGC joins the individual Defendants' arguments that Plaintiffs have not met the Reform Act's pleading requirements, have not attributed specific allegedly false representations to NGC, and those statements that Plaintiffs do identify solely with NGC relate to a future occurrence, which cannot provide the basis for any securities fraud liability.

Plaintiffs contend that NGC is liable as both a primary violator of Section 10(b) and Rule 10b-5, and also as a control person of Exp@nets. For the same reasons set forth above regarding Newell and Lewis, the Court finds that the Amended Complaint meets the pleading requirements as to a primary violation by NGC regarding Plaintiff Soberg's allegations of false statements in the Brochure. Plaintiffs specifically allege that NGC "participated in and/or approved" the Brochure. (AC ¶ 156, 37.) The motive and opportunity allegations against NGC specify that NGC was able to benefit from the purchase of each of Plaintiffs' companies for approximately one-half of their value by paying only approximately 50 percent cash and 50 percent stock in Exp@nets that NGC knew would not be worth 50 percent of the value of Plaintiffs' companies, because NGC did not intend to conduct an IPO for Exp@nets. (AC ¶ 156.) The allegations against NGC in the Amended Complaint are sufficient to state with particularity facts giving rise to a strong inference of scienter.

*See* 15 U.S.C. § 78u-4(b)(2); *Alpern*, 84 F.3d at 1533-34; *Green Tree*, 270 F.3d at 653 (explaining that although scienter is not explicitly mentioned in the statutory text or the rule, it is an essential element of a § 10(b) and Rule 10b-5 claim). Except for Plaintiff Soberg's allegations of false statements in the Brochure, the Section 10(b) and Rule 10b-5 claims will be dismissed against NGC for the same reasons the Court discussed above in connection with the claims against Defendants Newell, Lewis and Hylland.

The second issue is whether NGC can be held liable as a controlling person pursuant to Section 20(a) of the Exchange Act. NGC asserts that Plaintiffs have not adequately pled a controlling person claim against NGC under the Exchange Act because there is no reference to Section 20(a) in Count III. The Court disagrees. Plaintiffs refer to Section 20(a) in paragraph 6 of the Amended Complaint, and they incorporate paragraph 6 in Count III in paragraph 151. Thus, NGC can be held liable as a controlling person under Section 20(a) of the Exchange Act for Plaintiff Soberg's allegations of false statements in the Brochure.

### 3. Reliance Element

Defendants further allege that Plaintiffs' Amended Complaint should be dismissed because it does not plead reliance. They contend that Plaintiffs cannot establish reliance because (1) promises of IPOs are inherently unreliable; and (2) the sale agreements clarified that there was no guarantee of an IPO. Based upon the discussion above, the only remaining Section 10(b) and Rule 10b-5 claim is that in the Brochure Defendants made a false statement with intent to defraud Plaintiff Soberg. This aspect of Defendants' motion to dismiss is governed by the Rule 12(b)(6) standard, rather than the heightened pleading requirement under the Reform Act. Thus, Defendants can prevail on their argument only if, accepting as true Plaintiff Soberg's allegations, the Amended Complaint fails to allege any set of facts that would entitle him to relief.

The first issue relating to the Brochure that must be addressed, is whether the fact that it refers to an IPO in 1998 precludes Soberg from establishing reliance on the Brochure. Although the

22

Brochure indicates that the IPO was anticipated to occur in 1998 and the negotiations with Soberg did not occur until 1999, Soberg's allegation is that he was induced to sell his company to Exp@nets because of the representation that Exp@nets was "going to go public soon." (AC ¶ 98.) The Brochure was used in the negotiations with Soberg to convince him that the Defendants intended to pursue an IPO in the near future. Soberg was provided a reasonable explanation for the delay in the anticipated date of the IPO as stated in the Brochure: Exp@nets desired to add more data oriented companies, such as Vector, to Exp@nets before going public. (AC ¶ 94.) Plaintiffs allege that Defendants had no intention of going through with an IPO at any time. Thus, under Plaintiffs' theory, the anticipated date of an IPO in the Brochure was a misrepresentation regardless of the stated anticipated time frame for the IPO. The Brochure was used by Hogan to induce Soberg to sell his interest in Vector, and Hogan provided a reasonable explanation for not having gone public by the end of 1998 as represented in the Brochure. Soberg alleges he reviewed the Brochure in the process of negotiating with Hogan for the sale of his interest in Vector. At this stage of the proceedings, the fact that the Brochure stated the anticipated time frame of the IPO was in 1998 and the negotiations with Soberg did not begin until 1999, does not require a finding that Soberg can prove no set of facts regarding reliance that would entitle him to relief.

The second issue is whether Soberg would be entitled to relief based upon an alleged misrepresentation of the Defendants' intentions to conduct an IPO of Exp@nets' stock. Defendants contend that representations regarding the likelihood of an IPO can never form the basis of liability under Section 10(b) or Rule 10b-5, because one cannot reasonably rely on such statements. Each of the cases cited by Defendants for this proposition are examined below in connection with Plaintiffs' common law fraudulent inducement claims. Based upon the discussion below, distinguishing the cases cited by Defendants from the present case, the Court does not find that Plaintiff Soberg can prove no set of facts to establish that he reasonably relied upon the representations in the Brochure regarding Defendants' intentions to pursue an IPO of Exp@nets' stock.

23

The third issue regarding reliance, is whether a statement in the sales agreement that there was no assurance of an IPO[5] precludes a finding that Soberg reasonably relied on the statements in the Brochure regarding the intent to conduct an IPO. In the Amended Complaint, Soberg alleges that an investment advisor of Vector, Gary Prior, discussed with an Exp@nets' employee, Lueke, the lack of assurance of an IPO clause in the Supplemental Agreement. (AC ¶ 100.) Lueke "emphasized that the IPO was going to happen by the end of the year and that the clause was boilerplate language there to protect Exp@nets in case of any outside factor prevented the IPO. Prior relayed to Soberg that this was a standard clause and that based on all the representations made by Exp@nets regarding the impending IPO, the IPO was inevitable." (AC ¶ 100.) Based upon the information Plaintiff Soberg received regarding the "boilerplate" nature of this provision, the Court does not find Plaintiff is

---

[5]The Supplemental Agreement entered into between Soberg and Exp@nets included the following provision:

5.15    No Assurance of IPO.  The Company and the Shareholders acknowledge and agree:

(a)    that there exists no firm commitment, binding agreement, or promise or other assurance of any kind, whether express or implied, oral or written, that an IPO (or any other public offering of the capital stock of Parent) will occur at a particular price or within a particular range of prices or occur at all;

(b)    that neither Parent, any of its subsidiaries, any of their respective officers, directors, agent or representatives nor any prospective underwriter shall have any liability to any of the Companies, any Shareholder or any other person or entity affiliated or associated with any of the Companies for any failure of an IPO (or any other public offering of the capital stock of Parent) to occur at a particular price or within a particular range of prices or to occur at all; and

(c)    that the decision of each Shareholder to enter into this Agreement, or to vote in favor of or consent to the proposed Mergers, has been or will be made independent of, and without reliance upon, any statements, opinions or other communications, or due diligence investigations which have been or will be made or performed by any prospective underwriter or by Parent personnel, relative to Parent or any possible IPO (or any other public offering of the capital stock of Parent).

Request for Judicial Notice, Doc. 38, Ex. G, at pp. 29-30 of Supplemental Agreement.

barred as a matter of law from establishing that he reasonably relied on Defendants' representations regarding their intentions to pursue an IPO.

C.      Count II - Fraud in the Inducement

In Count II of the Amended Complaint, Plaintiffs contend that all Defendants are liable for fraud in the inducement because none of the Defendants had any intention of pursuing an IPO of Exp@nets' stock, but made representations to Plaintiffs that they intended to pursue such an IPO with the intent to induce Plaintiffs to sell their companies to Exp@nets at a considerable discount. (AC ¶ 146-48.) Defendants contend that Plaintiffs have failed to meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure, to plead fraud with particularity. As an additional basis for dismissal of Count II, Defendants contend that Plaintiffs' claims of fraudulent inducement fails as a matter of law because they do not meet the elements of fraud under South Dakota law. Defendants assert that Plaintiffs do not meet the first element of fraud by alleging a misrepresentation of a past or present fact. Defendants contend that all of the alleged misrepresentations concern future events, and that misrepresentations about future events are not actionable fraud. Another element of fraud Defendants claim is missing is justifiable reliance, because all of the alleged misrepresentations are explicitly contradicted in the written sales agreements. For the reasons set forth below, the Court does not find any of the Defendants' arguments persuasive and will deny the motions to dismiss Count II of the Amended Complaint.

South Dakota law provides that: "One who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." SDCL § 20-10-1 (2004). Deceit is defined by South Dakota law as follows:

A deceit within the meaning of § 20-10-1 is either:

(1)     The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

(2)     The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

(3)     The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

(4)     A promise made without any intention of performing.

SDCL § 20-10-2 (2004). South Dakota law further provides that, "every participant in a fraud and each one who assists another in the perpetration of the fraud is liable to the injured party." *Tueck v. Mueller*, 511 N.W.2d 832, 837 (S.D. 1994).

### 1.    Rule 9(b) - Pleading Fraud with Particularity

Federal Rule of Civil Procedure 9(b) provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." The Eighth Circuit has explained that, for Rule 9(b), "'[c]ircumstances' include such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentations and what was obtained or given up thereby .... Because one of the main purposes of the rule is to facilitate a defendant's ability to respond and to prepare a defense to charges of fraud, conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 644 (8th Cir. 1995) (quotations and citations omitted).

Newell and Lewis contend that only one of the 199 paragraphs of the Amended Complaint even attribute any statement to Newell or Lewis, that being paragraph 52, and that one paragraph lacks sufficient particularity. The Court disagrees. Although paragraph 52 does not allege an exact date, Plaintiffs narrow the time frame when the false representation was made down to one month in 1998. Moreover, the place where the misrepresentation allegedly was made is specifically identified as being at an industry conference in Los Angeles. This gives Newell and Lewis sufficient information regarding the alleged time and place of the false representation. The content of the false representation is also clear from paragraph 52: "[a]gain reiterating [Plaintiff Floyd's] refusal to sell his company unless he was assured that an initial public offering of Exp@nets stock would occur before the end of the 1998 calendar year, Lewis, Hylland, Newell and Younger each represented that an IPO would take place before the end of the year." (AC ¶ 52.)

26

The Court rejects Newell and Lewis' contention that they are named in only one paragraph in the Amended Complaint as making false representations to induce Plaintiffs to sell their companies to Exp@nets. Newell is specifically named in paragraphs 71 and 72 as participating in the solicitation of Plaintiff Sklaroff and being one of the Exp@nets' representatives that emphasized it was Northwestern's intent to take Exp@nets public by the end of 1998. In addition, as discussed above in connection with the Section 10(b) and Rule 10b-5 claims, a Brochure containing false representations about an IPO of Exp@nets' stock was used to induce Plaintiffs to sell their companies to Exp@nets. (AC ¶ 37, 45-101.) Plaintiffs allege that both Newell and Lewis participated in and/or approved the Brochure, which was used to solicit Plaintiffs to sell their companies to Exp@nets. These allegations meet the requirements of Rule 9(b) to state with particularity the circumstances constituting fraud against Newell and Lewis.

The Amended Complaint contains specific allegations of oral misrepresentations by Hylland in paragraph 52 and of alleged written misrepresentations in the Brochure in paragraphs 37 and 156, which nearly all of the Plaintiffs relied on in deciding whether to sell their companies to Exp@nets. As to Defendant NGC, the Amended Complaint alleges that NGC participated in and/or approved the Brochure that was used to solicit Plaintiffs to sell their companies to Exp@nets (AC ¶ 37, 156), despite NGC's lack of intention to pursue and IPO of Exp@nets' stock. These allegations against Hylland and NGC meet the requirements of Rule 9(b) to state with particularity the circumstances constituting fraud.

### 2. Representations of Future Events

The second basis for asserting Count II should be dismissed is that Plaintiffs fails to allege a misrepresentation of current fact because all the alleged misrepresentations concern future events. This argument is premised upon the law in South Dakota that, "'[g]enerally, representations as to future events are not actionable and false representations must be of past or existing facts." *Meyer v. Santema*, 559 N.W.2d 251, 255 (S.D. 1997). Plaintiffs argue that Defendants mischaracterize their allegations. Rather than alleging that Defendants are liable for misrepresenting the fact that an IPO of Exp@nets would occur, Plaintiffs clearly allege throughout their Amended Complaint that

27

Defendants had *no intention of pursuing* an IPO of Exp@nets' stock, regardless of future events, and, thus, Defendants *knew* an IPO would never occur.

The cases cited by Newell and Lewis concerning misrepresentations of future events are distinguishable from Plaintiffs' allegations. The first case, *Bayer v. PAL Newcomb Partners*, 643 N.W.2d 409 (S.D. 2002), is a case involving a real estate development that did not develop as planned. The appellate court specifically recognized that, "[t]he trial court did not find that [the defendant] made any misrepresentations about past or existing facts." *Id.* at 413. The plaintiffs in *Bayer* did not allege that the defendant never had any intention of developing the property as he represented to the plaintiffs. Rather, plaintiffs' claim was that the development did not develop as planned and that defendant was liable for negligent misrepresentation. The Court further found the buyer and seller were on equal footing. The Plaintiffs in the present case make significantly different allegations: Defendants made representations that they knew were false when made and Defendants never had any intention of pursuing the IPO they informed Plaintiffs they were intending to pursue. Plaintiffs allege they were not on equal footing with Defendants to the extent that only Defendants could know whether they had the intention to pursue an IPO. Thus, *Bayer*, is distinguishable and does not control the outcome of the present case.

In the second case cited by Newell and Lewis, *Milligan v. Waldo*, 620 N.W.2d 377 (S.D. 2001), the South Dakota Supreme Court stated that, "[f]or misrepresentation to be actionable, [plaintiff] must prove: (1) [defendant] represented to [plaintiff] as a fact the trust land would be deeded to [plaintiff], but that [defendant] did not believe at the time that it would be deeded; ...." The court found that the plaintiff "failed to provide any evidence of fraudulent concealment or misrepresentation or negligent misrepresentation on the part of [defendant] as it provided [plaintiff] with all the information known to [defendant] concerning the issuance of the patents." *Id.* at 380. It was further established that plaintiff was privy to the same information as defendant regarding the potential issuance of a patent by the Federal government. *Id.* at 381. Rather than supporting Defendants' argument, this case recognizes that a statement of material fact made without believing

28

it to be true, or at least having a reasonable basis for believing it to be true, can form the basis of a fraud claim.

The third case, *Meyer*, 559 N.W.2d at 255, involved a representation by the City of White that it would rezone, from residential to industrial, lots the plaintiff was considering buying for development of a trucking development. After citizens objected to the rezoning of the land to industrial, the City rescinded its resolution to rezone the property and plaintiff did not obtain a building permit for the trucking development on the purchased lots. *See id.* at 253-54. The South Dakota Supreme Court held that the City's representation to the plaintiff "indicated a future event or occurrence." *Id.* at 255. In addition, the court found that, "City's misrepresentations concerned interpretation and implementation of a zoning ordinance, which is a matter of law – misrepresentations of law are not actionable." *Id.* Thus, this case did not involve allegations of lack of intention to do what was represented.

The Court concludes that the cases cited by Newell and Lewis in support of this "future event" argument do not entitle them to relief on their motion to dismiss, because a representation about one's present intentions is not conjecture about future events and falls within the definition of deceit in SDCL § 20-10-2. In addition to the significant factual distinctions discussed above, the cases cited by Newell and Lewis were submitted to the South Dakota Supreme Court on summary judgment motions and after a decision on the merits, rather than on motions to dismiss. Thus, the standard for evaluating Defendants' motion to dismiss in this case is more lenient than the standards applied to the defendants' motions in those cases.

Defendants do not discuss an exception to the general rule that representations as to future events are not actionable. *See Bayer*, 643 N.W.2d at 413. One exception is that "'[a] misrepresentation as to a future event may be actionable where the parties to the transaction are not on equal footing but where one has or is in a position where he should have superior knowledge concerning the matters to which the misrepresentations relate.'" *Id.* (quoting *Reitz v. Ampro Royalty Trust*, 61 N.W.2d 201, 203 (1953)); *see Mobridge Cmty. Indus., Inc. v. Toure, LTD.*, 273 N.W.2d

29

128, 133 (S.D. 1978) (recognizing that "an exception comes into existence when the misrepresentation of future event is in regard to a matter which is peculiarly within the speaker's knowledge.) Even if Defendants' representations about their intention to pursue an IPO of Exp@nets's stock are found to concern a future event, Plaintiffs can survive the motion to dismiss based upon this exception. If Plaintiffs can prove that Defendants had no actual intention of pursuing an IPO of Exp@nets' stock, they would fall under this exception because Plaintiffs and Defendants would not have been on equal footing as Defendants had superior knowledge about their intentions of pursuing an IPO.

Another exception to the general rule is that, "[a] promise relating to a future event may constitute actionable fraud when made without intention of performance." *Reitz v. Ampro Royalty Trust*, 61 N.W.2d 201, 203 (S.D. 1953). This rule is codified at SDCL § 20-10-2(4), wherein South Dakota law provides that one definition of deceit is, "[a] promise made without any intention of performing." Plaintiffs' Amended Complaint has alleged sufficient facts to demonstrate that they may be able to establish Defendants' liability based upon this exception if Defendants' representations are found to be a promise relating to a future event.

Additional cases are cited by Newell and Lewis concerning securities fraud cases where courts determined the representations about the likelihood of an IPO were not actionable. As with the South Dakota cases cited by Newell and Lewis, the Court finds these cases distinguishable from the present case. In *Niki Dev. Corp. v. HOB Hotel Chicago Parnters, L.P.*, 2003 WL 1712563 (N.D. Ill. March 31, 2003), the Court found, in the context of a summary judgment motion, that statements as well as planning for an IPO were made, but such a representation cannot be found to be a misrepresentation of an existing fact. In *Niki*, the Court found that the defendant never guaranteed that an IPO would be completed at a particular time and further found that it was "undisputed that [the defendant] was hoping to go forward with an Initial Public Offering in 1996." *Id.* at *7, 10. The plaintiff in *Niki* did not seek to establish liability on a fraudulent inducement theory by alleging that the defendant *never intended* to go forward with an IPO.

30

In *Weinstein v. Appelbaum*, 193 F.Supp.2d 774, 779 (S.D.N.Y. 2002), the court found the plaintiffs' complaint did not satisfy the pleading standards for stating a fraud claim and specifically found that, "[t]here is no factually sufficient (as opposed to conclusory) allegation that [the defendant's statement that it intended to go public in an IPO] was untrue at the time it was made. In the absence of such an allegation, all that is alleged is a promise to do something in the future, which will not support a claim of fraud." In contrast to the plaintiffs' complaint in *Weinstein*, the Court specifically found above that Plaintiffs' Amended Complaint in this action satisfies the Rule 9(b) standard for pleading fraud with particularity. Moreover, under South Dakota law a promise to do something in the future *without any intention of performing* is actionable fraud. *See* SDCL § 20-10-2 (4).

In *Millcreek Assoc., L.P. v. Bear, Sterns & Co.*, 205 F.Supp.2d 664, 675, 681-82 (W.D. Tex. 2002), the court agreed with the defendants' arguments for dismissal and thus found that the plaintiff had failed to allege that pre-IPO statements were false when made or that defendants made such statements without knowledge of their truth. In addition, the *Millcreek* court noted that the plaintiff ignored the fact that the pre-IPO statements were "usually coupled with cautionary language, requiring application of the bespeaks caution doctrine, which remove the statements from the category of actionable language." *Id.* at 682. The Plaintiffs in the present case clearly have alleged that Defendants' statements about their intention to pursue an IPO were false when made and Defendants do not assert that the bespeaks caution doctrine applies to Plaintiffs' claims in this action.

In *Donner v. Keefe, Bruyette & Woods, Inc.*, 157 F.Supp.2d 265, 277-78 (S.D.N.Y. 2001), the court found that, "[t]he amended complaint only describes characterizations by the defendants about the future prospects of the IPO." Defendants allegedly made statements such as the IPO was a "sure thing" or a "done deal," and that the plaintiff would "make a lot of money." *Id.* The *Donner* court held that the amended complaint did not allege a material false representation of an existing fact because the fraud claim was "based entirely on representations with respect to uncertain future events and cannot support an action for fraud. The *fulfillment of plans* for any IPO is never a

31

certainty." *Id.* (emphasis added). In the present case the Plaintiffs allege there were no actual plans to pursue an IPO. Thus, the allegations in the present case are distinguishable from those in *Donner*.

The case of *Metro Communication Corp. BAI v. Advanced Mobilecomm Tech.*, 854 A.2d 121, 149 (Del.Ch. 2004), is also factually distinguishable from the present case, because in that case the court found that, "the complaint does not contain sufficient detail from which one could reasonably infer that the defendants did not believe that an IPO could occur." Plaintiffs specifically allege that Defendants *knew* an IPO would not occur because they never intended to pursue an IPO of Exp@nets' stock.

Newell and Lewis attempt to align this case with the cases regarding representations of the prospect of an IPO by arguing that, "sophisticated business people like Plaintiffs knew an IPO depends on the state of the economy, an investment bank's analysis of the company's health and marketability, as well as a myriad of other tangible and intangible factors, few of which were in the knowledge or control of Newell or Lewis." (Reply Brief, Doc. 69 at 13.) The fallacy of this argument, however, is that Plaintiffs specifically allege the one factor that was within the knowledge or control of Defendants was the *intention* to pursue an IPO and Plaintiffs did not know Defendants had no intention of pursuing an IPO.

Plaintiffs have been careful to distinguish their allegations from the types of allegations that courts have found barred as a matter of law. It is not disputed by Plaintiffs that statements about the *prospect* of an IPO are not representations of present material facts, because an IPO is an inherently uncertain event. Plaintiffs are not alleging that Defendants are liable for fraudulent inducement *solely* because an IPO never happened, which would be a representation about a future event. Rather, Plaintiffs are alleging that Defendants *knew* an IPO would never happen because they never had any intention of conducting an IPO, and despite this knowledge, they represented to the Plaintiffs that an IPO was planned and they intended to pursue it. These allegations are accepted as true at this point in the proceedings and the Court does not find that Plaintiffs will be unable to prove any set of facts to establish Defendants' liability for fraud pursuant to SDCL §§ 20-10-1 and 20-10-2.

32

### 3. Written Agreements

Defendants contend that the alleged misrepresentations regarding an Exp@nets IPO are directly contradicted by the written agreements signed by the Plaintiffs, which is fatal to Plaintiffs' cause of action for fraud under South Dakota law. The language in the agreements is quoted in footnote 5 above. The South Dakota Supreme Court's decision in *Schwaiger v. Mitchell Radiology Assoc., P.C.*, 652 N.W.2d 372, 377 (S.D. 2002), is cited by Newell and Lewis in support of this argument. Defendants contend that Plaintiffs' fraudulent inducement claims are analogous to the plaintiff's claim in *Schwaiger*. The *Schwaiger* court held that, "if a written contract is in direct contradiction of an oral representation, reliance on that oral representation, as a matter of law, is unjustified." 652 N.W.2d at 377 (citing *Davidson v. Wilson*, 973 F.2d 1391, 1401 (8th Cir. 1992)).

Plaintiffs contend that *Schwaiger* is distinguishable from this case and that their claims are analogous to the claims by the plaintiffs in the case of *Fritzmeier v. Kraus Gentle Corp.*, 669 N.W.2d 699 (S.D. 2003). The *Fritzmeier* court reached a different result than that in *Schwaiger* by finding that the facts in *Fritzmeier* were distinguishable from *Schwaiger*. *See Fritzmeier*, 669 N.W.2d at 706. One of the factors used to distinguish the cases was that the Plaintiffs in *Fritzmeier* were presented with and signed a 25-page non-negotiable contract after receiving the franchise's literature containing misrepresentations about the likely profitability of a franchise. 669 N.W.2d at 707. The plaintiff in *Schwaiger*, however, negotiated the terms of his written employment contract with the defendants, including making counter proposals. 652 N.W.2d at 379. In this case, it appears the only negotiable part of the over 50-page contract presented to and signed by Plaintiffs was the valuation of Plaintiffs' companies. Plaintiffs specifically asked about the "No Assurance of IPO" clause Defendants now seek to use as a shield, and were told that the clause was "boilerplate" and it was in the contract in the event some "outside" factor prevented the IPO. They were not told that there was no intention to pursue an IPO, regardless of the existence of some "outside" factor preventing the IPO. Thus, as in *Fritzmeier*, the provision Defendants seek to use as a bar to Plaintiffs' claim was apparently non-negotiable. In addition, in light of Defendants' alleged lack of intent to pursue an IPO, Plaintiffs were not dealing with Defendants as equals with equal access

33

to information while the parties in *Schwaiger* were negotiating at arm's length and with equal access to relevant information.

One of the other factual distinctions between *Fritzmeier* and *Schwaiger*, was that the court found in *Schwaiger* there were no "specific material facts indicating that [the defendant] wrongfully induced [the plaintiff] to enter the initial employment contract with [the defendant]." *Schwaiger*, 652 N.W.2d at 379. Part of the rationale for this conclusion was the court's finding that, "[t]he mere subjective expectation of one professional cannot rise to the level of fraudulent inducement." 652 N.W.2d at 379. In contrast, the *Fritzmeier* court found the plaintiffs did establish the defendants made representations, such as "immediate cash flow" and "no restaurant experience necessary," which induced plaintiffs to sign the franchise agreements. Like *Fritzmeier*, and distinguishable from *Schwaiger*, Plaintiffs in the present case allege Defendants made false representations regarding their intentions that induced Plaintiffs to sign the Supplemental Agreement.

In an effort to distinguish the present case from *Fritzmeier*, Newell and Lewis argue the Plaintiffs in this case are experienced owners of million-dollar companies compared to the plaintiffs in *Fritzmeier* who had little or no business experience. Plaintiffs here, however, are not alleging they were unsophisticated business owners who were unable to evaluate the market conditions, the economy, or the likely outcome of an investment bank's analysis of Exp@nets' health and marketability. Rather, despite Plaintiffs' business acumen, they were not in a position to know that, despite Defendants' oral representations and written representations in the Brochure, Defendants had no intention of pursuing an IPO. Thus, the Defendants are alleged to have made false representations of knowledge that was solely within their control.

In addition to relying on the "No Assurance of IPO" clause in the Supplemental Agreements, Newell and Lewis seek dismissal of Plaintiffs claims pursuant to the general integration clause, which provides:

> **11.7  Entire Agreement**. This Agreement and the Merger Agreements (including the Schedules and Exhibits attached hereto) constitute the entire agreement and

> supersede all prior agreements and understandings, both written and oral, among the
> parties with respect to the subject matter hereof.

(Request for Judicial Notice, Doc. 38, Ex. B-G, at p. 45 of Supplemental Agreement). While
Defendants may be entitled to rely on an integration clause if Plaintiffs were bringing a breach of
contract action, Plaintiffs are not bringing such an action. Rather, they are alleging that they were
fraudulently induced to *enter into* the contracts that contain the integration clause.

As in *Fritzmeier*, the Plaintiffs claim the oral representations regarding Defendants'
intentions "contributed to induce Plaintiffs to sign" the Supplemental Agreements. 669 N.W. 2d at
707. In a further attempt to distinguish the present case from *Fritzmeier*, Newell and Lewis assert
it is very significant that the *Fritzmeier* court relied on a statute expressly prohibiting integration
clauses in franchise agreements from barring misrepresentation actions. (Doc. 69 at 14.) The Court
disagrees. The statute prohibiting integration clauses was an *additional* basis on which to reject the
defendants' argument in *Fritzmeier*. *Id.* (rejecting the defendants' argument and then further relying
on the statute at issue by stating, "*Furthermore*, SDCL § 37-5A-86 contemplates franchise cases
such as this ...."). Before relying on the statute, the *Fritzmeier* court cited the case of *Commercial
Prop. Inv., Inc. v. Quality Inns Int'l, Inc.*, 938 F.2d 870, 875 (8th Cir. 1991), for its holding denying
summary judgment to defendant by stating that, "the 'oral representations occurred at the outset of
the sale, creating a fraudulent foundation for the subsequent dealings.'" *Fritzmeier*, 669 N.W.2d at
707. The *Fritzmeier* court then held that, "[t]he Plaintiffs claim that [defendants' representations
such as 'immediate cash flow' and 'no restaurant experience necessary'] contributed to induce
Plaintiffs to sign the franchise agreements. [Defendant] cannot be allowed to use the non-negotiable
written contract as a shield from liability." 669 N.W.2d at 707. Thus, even in absence of the statute,
the South Dakota Supreme Court found that a defendant cannot use a general integration clause in
a non-negotiable agreement to bar a claim for fraudulent inducement where false statements were
made by the defendant scrivener and such false statements contributed to induce the plaintiff to sign
the agreement. Based upon the above discussion, Plaintiffs' claims of fraudulent inducement are not
barred as a matter of law by the general integration clause in the non-negotiable Supplemental
Agreement.

35

D.      Counts V to IX - State Securities Law Claims

All of the Plaintiffs allege violations of the state securities laws in the State of their residence, which are alleged in Counts V to IX. Defendants contend that all of Plaintiffs state securities laws' claims are barred by the applicable statutes of limitations. For the reasons set forth below, the Court finds that all of the Plaintiffs' state securities law claims are time-barred, except Plaintiffs Cohen and Richards' securities fraud claim pursuant to the Mississippi Securities Act under Count VIII.

### 1. Count V - Texas Security Act

Plaintiffs Floyd, Rafferty and Dolde bring their claim under Texas law, which provides that "[n]o person may sue [for securities fraud]: (a) more than three years after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence; or (b) more than five years after the sale; ...." Texas Code Ann. Art. 581-33(H)(2). Texas law further provides a period of "three years after the sale" to bring a civil action for failure to register securities. *See* Texas Code Ann. Art. 581-33(H)(1). These statutes are very similar to the federal statute applicable to alleged violations of certain federal securities laws, which the Supreme Court has determined is a statute of repose. *See* 15 U.S.C § 77m; *Lampf*, 501 U.S. at 363 (holding that the three-year limit in 15 U.S.C. § 77m is a period of repose, which is an outside limit and is not subject to equitable tolling). The Court finds the Texas statutes under which Plaintiffs Floyd, Rafferty and Dolde seek to hold Defendants liable are statutes of repose, not subject to equitable tolling. Given Plaintiffs Floyd, Rafferty and Dolde's concessions that they commenced this action more than five years after the sale of their respective companies to Exp@nets, the Court will dismiss Count V as time-barred.

### 2. Count VI - Oklahoma Securities Act

Plaintiffs explain in their Opposition to Newell and Lewis' Motion to Dismiss, Doc. 65, that the factual allegations regarding Plaintiff Everest's claims were inadvertently deleted in the Amended Complaint. These allegations were set forth in the original Complaint at paragraphs 66 through 79. Plaintiffs offer to amend the Amended Complaint to add these inadvertently omitted allegations. (Doc. 65 at p. 20, n.1.) The Court will allow this informal request to amend for

purposes of the state securities law claims, as Defendants will not suffer any prejudice, but will require Plaintiffs to make a formal motion to amend the complaint to add any additional claims on behalf of Plaintiff Everest. The Court finds that Plaintiff Everest's claims in Count VI, based upon the Oklahoma Securities Act, are barred by the statute of repose in Okla. Stat. tit. 71, § 408(f) (Repealed by 2003, c. 347, § 53, eff. July 1, 2004), which provides: "[n]o person may sue [for failure to register securities under the Oklahoma Securities Act] more than three (3) years after the sale. No person may sue [for securities fraud under the Oklahoma Securities Act] more than two (2) years after the untruth or omission was discovered, but in no event more than three (3) years after the sale." Like the Texas statute quoted above, the Oklahoma statute is very similar to the federal statute applicable to alleged violations of certain federal securities laws, which the Supreme Court has determined is a statute of repose. *See* 15 U.S.C § 77m; *Lampf*, 501 U.S. at 363. The Court finds the Oklahoma statute quoted above is a statute of repose. Plaintiff Everest sold his company to Exp@nets on November 25, 1998, which was more than three years before this action was filed. Thus, the Court finds Plaintiff Everest's claims in Count VI are barred by the Oklahoma three-year statue of repose and will be dismissed.

### 3. Count VII - Pennsylvania Securities Act

Plaintiffs Sklaroff, Durham and Tomlinson bring claims under Sections 401, 402, 501, and 502 of the Pennsylvania Securities Act. Section 402 prohibits certain market manipulation that is not alleged in this action. Thus, the Section 402 claim will be dismissed for failure to state a claim upon which relief may be granted. Plaintiffs' Section 401 and 501 claims are barred by the statute of repose applicable to these securities fraud claims under Pennsylvania law: "[n]o action shall be maintained to enforce any liability created under section 501 [relating to securities fraud prohibited in section 401] (or section 503 in so far as it relates to that section) unless brought before the expiration of four years after the act or transaction constituting the violation or the expiration of one year after the plaintiff receives actual notice or upon the exercise of reasonable diligence should have known of the facts constituting the violation, whichever shall first expire." Pa. Stat. Ann. tit. 70 § 504(a) (amended by 2004 Pa. Legis. Serv. Act 2004-130 (H.B. 599) (PURDON'S)).

37

The failure-to-register claim, a violation of Section 502 of the Pennsylvania Securities Act, is barred unless "brought before the expiration of two years after the violation upon which it is based or the expiration of one year after the plaintiff receives actual notice or upon the exercise of reasonable diligence should have known of the facts constituting such violation, whichever shall first expire." *Id.* at § 504(b). Like the Texas and Oklahoma statutes quoted above, the Pennsylvania statutes are very similar to the federal statute applicable to alleged violations of certain federal securities laws, which the Supreme Court has determined is a statute of repose. *See* 15 U.S.C § 77m; *Lampf*, 501 U.S. at 363. The Court finds the Pennsylvania statutes quoted above are statutes of repose, not subject to equitable tolling, *See Hansen v. Shearson/American Express., Inc.*, 890 F.Supp. 416, 425 (E.D. Pa. 1995) (finding that "[e]quitable tolling is, of course, inconsistent with the three-year limitations period in § 1-504(a)," which was subsequently changed to the four-year limitations period applicable to the claims in this action). These Plaintiffs also seek to hold some Defendants liable as controlling persons under Section 503 of the Pennsylvania Securities Act. Plaintiff Sklaroff sold his company to Exp@nets on June 30, 1999 and Plaintiffs Tomlinson and Durham sold their company to Exp@nets on September 30, 1999, which was more than four years before this action was filed. Thus, the Court finds Plaintiff Sklaroff, Durham and Tomlinson's Section 401, 501, 502 and 503 claims in Count VII are barred by the statues of repose and will be dismissed.

### 4. Count VIII - Mississippi Securities Act

Plaintiffs Cohen and Richards bring a claim under the Mississippi Securities Act for failure to register pursuant to Sections 75-71-401 and 75-71-717, and for fraudulent statements pursuant to Sections 75-71-501 and 75-71-717. The failure-to-register claims are barred by the statute of repose in Section 75-71-725, which provides that "[n]o action shall be maintained ... to enforce a liability created under section 75-71-717(1) [for failure to register] unless brought within two (2) years after the violation upon which it is based." Miss. Code Ann. § 75-71-725. The sale of Plaintiffs Cohen and Richards' company to Exp@nets was completed on March 22, 1999, which was more than two years before they filed this action. The statute applicable to Cohen and Richards' state securities fraud claim provides that, "[n]o action shall be maintained to enforce any liability created under

section 75-71-717(2) unless brought within two (2) years after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence ...." Miss. Code Ann. § 75-71-725. This statute is not a statute of repose like those applicable to the state securities fraud claims in Counts V through VII.

The doctrine of inquiry notice, discussed above in connection with the Section 10(b) and Rule 10b-5 claims under the Exchange Act, appears to be applicable to the statute of limitations under Mississippi law. The Amended Complaint alleges that, "[r]epresentatives of Exp@nets including, Walker, Younger, Hylland and Lewis continued to represent to minority shareholders that an IPO of Exp@nets stock would occur." (AC ¶ 115.) Thus, Plaintiffs allege that at least some of the Defendants continued to assure Plaintiffs they intended to pursue an IPO of Exp@nets. Similar to the three Plaintiffs' claims that were not barred by the statute applicable to federal securities fraud claims before enactment of the Sarbanes-Oxley Act, the Court does not find the Amended Complaint shows that Plaintiffs Cohen and Richards either knew of the alleged fraud or that they were on inquiry notice of the alleged fraud not later than March 17, 2002, two years before they filed this action. In sum, Plaintiffs Cohen and Richards' failure-to-register claim under the Mississippi Securities Act will be dismissed as barred by the statute of repose in Section 75-71-725, but their securities fraud claim under this Act will not be dismissed.

### 5. Count IX - Arizona Securities Act

Pursuant to the Arizona Securities Act, Plaintiff Soberg brings claims for failure to register the securities sold to him by Exp@nets and for fraudulent statements. Soberg sold his interest in Vector to Exp@nets on September 30, 1999. At that time, the limitation of civil actions for the failure-to-register claim provided that, "[n]o civil action shall be maintained under this article to enforce any liability based on a violation of § 44-1841 [for failure to register] ... unless brought within one year after the violation occurs." Ariz. Rev. Stat. Ann. § 44-2004(A) (1999). This action was not filed until long after the failure-to-register claim expired under Arizona law and it will, therefore, be dismissed.

39

In September 1999, the limitation of civil actions for fraud in the purchase or sale of securities under §§ 44-1991 and 44-1998 of the Arizona Securities Act provided that, "[n]o civil action shall be brought under this article to enforce any liability based on a violation of § ... 44-1998 [for fraud in the purchase or sale of securities] unless brought within one year after the discovery of the untrue statement or the omission or after the discovery should have been made by the exercise of reasonable diligence. No action shall be brought to enforce a liability created ... under § 44-1998 more than three years after the sale." Ariz. Rev. Stat. Ann. § 44-2004(C) (1999). The Court finds that the three-year period in this statute is a period of repose similar to the other state statutes of repose discussed above and certain federal securities laws, which the Supreme Court has determined is a statute of repose, not subject to equitable tolling. *See* 15 U.S.C § 77m; *Lampf*, 501 U.S. at 363. The sale of Plaintiff Soberg's interest in Vector to Exp@nets was completed on September 30, 1999, which was more than three years before this action was filed.

In 2003, this statute was amended similar to the Sarbanes-Oxley Act to allow an action to be brought within two years of discovering the alleged fraud, but barring any action more than five years after the sale. *See* Ariz. Rev. Stat. Ann. § 44-2004(C) (2003). This action was time-barred by the Arizona Securities Act at the time the amendment changed the statute on limitation of actions. There is no language in the statute indicating the Arizona legislature intended to revive claims that were time-barred under the prior statute. Similar to the Exchange Act claims that were time-barred prior to the enactment of the Sarbanes-Oxley Act, the Court does not find that the 2003 amendment to the Arizona Securities Act revived previously time-barred claims. Thus, the Court will dismiss Plaintiff Soberg's claims under the Arizona Securities Act in Count IX.

Plaintiff Soberg inadvertently omitted allegations of control person liability under the Arizona Securities Act. In response to the motions to dismiss, he offered to amend the Amended Complaint to include such allegations. That request will be denied, however, because a claim of control person liability would likewise be time-barred rendering such an amendment futile.

40

E.      Counts X and XI - Fiduciary Duty Claims

Plaintiffs concede that Count X, alleging a claim of negligence against Defendants Lewis, Newell and Hylland, is a derivative claim and may be dismissed. In Count XI, Plaintiffs allege Defendants Lewis, Hylland, Newell and Exp@nets' successor-in-interest, Avaya, are liable for breach of the fiduciary duty of loyalty to the Plaintiffs as minority shareholders. It is alleged that when acting as Exp@nets' Board of Directors, Lewis, Hylland and Newell acted to further their own self-interest or that of Northwestern or NGC, and not the interests of Exp@nets and its minority shareholders.

Defendants contend that Count XI, like Count X, is a derivative claim and must be dismissed because that claim can only be brought by the Bankruptcy Trustee. Disputing that Count XI is a derivative claim, Plaintiffs contend the alleged breach of fiduciary duty harmed Plaintiffs, as Exp@nets' minority shareholders, but favored Exp@nets' majority shareholder, Northwestern, and thus, is an action that can be brought by the minority shareholders. In support of this argument, Plaintiffs cite the case of *Grimes v. Donald*, 673 A.2d 1207, 1213 (Del. 1996), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000), in support of their assertion that a shareholder's claim is direct, rather than derivative, if the shareholder alleges an injury separate and distinct from that suffered by other shareholders. In 2004, however, the Supreme Court of Delaware rejected this "special injury" analysis in determining whether a claim is derivative or direct. *See Tooley v. Donalson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004) (en banc). The *Tooley* court explained that the analysis to distinguish between direct and derivative actions "must be based solely on the following questions: who suffered the alleged harm – the corporation or the suing stockholder individually – and who would receive the benefit of the recovery or other remedy?" *Id.*

Other than generally incorporating all of the allegations in the Amended Complaint, Plaintiffs do not specify in Count XI what harm they or Exp@nets suffered as a result of the alleged breach of fiduciary duty of loyalty. In their opposition to Hylland's motion to dismiss, Doc. 63, Plaintiffs point to three types of harm: continuing misrepresentations to Plaintiffs, as minority shareholders, regarding the status of the IPO (AC ¶¶ 102-118); imposing improper cross-charges for services

41

allegedly provided by Northwestern to Exp@nets without regard to the value received by Exp@nets or the detrimental effects to the minority shareholders of Exp@nets (AC ¶ 114); and Lewis, Hylland and Newell's receipt of millions of dollars in Exp@nets private equity company "profits" at the direct expense of Exp@nets and the minority shareholders. (AC ¶ 116.).

The Court of Chancery of Delaware held that a shareholder's claim of harm as a result of a failure of the company to go public is, "in the first instance, an injury to [the company] itself and is therefore derivative in nature." *Metro Communication.*, 854 A.2d at 167-68. The Court does not find that Plaintiffs' claims are materially distinguishable from the shareholder's claim in *Metro Communication*, and thus, finds that the alleged harm regarding the IPO is an injury to Exp@nets itself, rather than solely an injury to the shareholders. The allegations of imposing improper cross-charges (AC ¶ 114) and the individual Defendants' receipt of Exp@nets "profits" (AC ¶ 116) clearly state that Exp@nets suffered a direct financial injury as a result of these actions. Because the alleged harm involved in Count XI was suffered by Exp@nets, the claims in Count XI are derivative under the *Tooley* court's analysis. 845 A.2d at 1035. Although Plaintiffs may normally have the ability to bring a derivative claim in certain situations, "[a] corporation's filing for bankruptcy cuts off a shareholder's ability to bring a derivative claim." *In re Gen. Dev. Corp.*, 179 B.R. 335, 338 (S.D. Fla. 1995). Only the bankruptcy trustee has standing to pursue a derivative claim. *See id.* Plaintiffs do not contest that the successor-in-interest to Exp@nets filed for bankruptcy. As a result of the above discussion, Count XI will be dismissed without prejudice.

F.      Request for Judicial Notice

In ruling on the pending Motions to Dismiss, the Court took judicial notice of Netexit's voluntary petition for bankruptcy because it is a public record, *see Stahl v. United States Dept't of Agriculture*, 327 F.3d 697, 700 (8th Cir. 2003), and Northwestern's Annual Report, because it was not offered for the truth of the matters asserted therein, *see Green Tree*, 270 F.3d at 663 (noting that courts have taken judicial notice of SEC filings if not offered for the truth of the matters asserted therein). In addition, the Court considered the contract documents because they were referenced by Plaintiffs in the Amended Complaint. *See id.* (explaining that "[i]n a case involving a contract, the

42

court may examine the contract documents in deciding a motion to dismiss."); *Kushner v. Beverly Enter., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (explaining that "'when deciding a motion to dismiss, a court may consider the complaint and documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading.'") (quoting *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996)).

## CONCLUSION

Based upon the above discussion, the Court will grant the Defendants' Motions to Dismiss on the following claims: (1) Count I, alleging violations of Section 12(a)(2) of the Securities Act, because these claims are time-barred; (2) Count III, alleging violations of Section 10(b) and Rule 10b-5, as to (a) Plaintiffs Floyd, Rafferty, Dolde, Cohen, Richards and Sklaroff, because their claims are time-barred; and (b) Plaintiffs Tomlinson and Durham, because they have not satisfied the Reform Act's pleading requirements; (3) Counts V, VI, VII, and IX, alleging violations of state securities' laws, because they are time-barred; (4) Plaintiffs Cohen and Richards' failure-to-register claim in Count VIII; and (5) Counts X and XI, because they are derivative claims that can only be pursued by the Bankruptcy Trustee.

The only portion of Plaintiff Soberg's Section 10(b) and Rule 10b-5 claims that remain against the Defendants are the allegations regarding the Brochure, because none of the Defendants are alleged to have made oral misrepresentations directly to Plaintiff Soberg. Count II alleging fraudulent inducement will not be dismissed. In addition, Plaintiffs Cohen and Richards' securities fraud claim pursuant to the Mississippi Securities Act under Count VIII will not be dismissed. Accordingly,

IT IS ORDERED:

1.     That Defendants Merle D. Lewis and Daniel K. Newell's Motion to Dismiss, Doc. 36, Defendant Northwestern Growth Corporation's Motion to Dismiss, Doc. 41, and Defendant Richard Hylland's Motion to Dismiss, Doc. 44, are granted to the extent that the following claims in the Amended Complaint will be dismissed:(A) Count I, alleging violations of Section 12(a)(2) of the

43

Securities Act, (B) Count III, alleging violations of Section 10(b) and Rule 10b-5, and Section 20(a) as to Plaintiffs Floyd, Rafferty, Dolde, Cohen, Richards, Sklaroff, Tomlinson and Durham; (C) Counts V, VI, VII, and IX, alleging violations of state securities' laws;   (D) Plaintiffs Cohen and Richards' failure-to-register claim in Count VIII; and (5) Counts X and XI. The motions are denied in all other respects.

2.     That the rulings in paragraph One apply to Defendant Avaya, Inc.'s joinder in the Defendants' Motions to Dismiss.

Dated this __19th__ day of August, 2005.

BY THE COURT:

Lawrence L. Piersol
Chief Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: _____
DEPUTY

44